QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Charles K. Verhoeven (Bar No. 170151)
  charlesverhoeven@quinnemanuel.com
  David Eiseman (Bar No. 114758)
  davideiseman@quinnemanuel.com
  Sam Stake (Bar No. 257916)
  samstake@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California 94111-4788
Telephone:      (415) 875-6600
Facsimile:      (415) 875-6700

  Lance Yang (Bar No. 260705)
  lanceyang@quinnemanuel.com
865 S. Figueroa St., 10th Floor
Los Angeles, California 90017
Telephone:      (213) 443 3000
Facsimile:      (213) 443 3100

Attorneys for Plaintiff KEYSSA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| KEYSSA, INC.,<br><br>        Plaintiff,<br><br>    vs.<br><br>ESSENTIAL PRODUCTS, INC.,<br><br>        Defendant. | CASE NO. 17-5908<br><br>**COMPLAINT**<br><br>**1.  VIOLATION OF DEFEND TRADE SECRETS ACT**<br><br>**2.  VIOLATION OF CALIFORNIA UNIFORM TRADE SECRETS ACT**<br><br>**3.  BREACH OF CONTRACT**<br><br>**DEMAND FOR JURY TRIAL** |

## I.     **INTRODUCTION**

1.      Plaintiff Keyssa, Inc. ("Keyssa") is a pioneer in the emerging field of close-proximity high-speed wireless connectivity.  This type of connectivity provides a point-to-point connection between two devices, instead of a connection using a shared network such as WiFi.  It is often referred to as "contactless connectivity."  Since its founding in 2009, Keyssa has invested many tens of millions of dollars and tens of thousands of hours of engineering time on an ambitious challenge: to wirelessly connect devices at speeds as fast as high-speed interfaces such as HDMI or USB, protocols that typically are connected via metal wire connectors, without sacrificing security, and with minimal power consumption.  To meet this challenge, Keyssa had to combine the diverse disciplines of materials science, physics, engineering, and industrial design in order to transmit and receive data using waves oscillating at *30 to 300 billion* cycles per second (fast enough to transmit a one gigabyte HD movie in under two seconds).  The result of Keyssa's concerted efforts has been the development of a market-ready semiconductor-based solution, myriad trade secrets, and the issuance of more than 100 patents worldwide.  Keyssa's technology enables manufacturers to create new device designs and functionality not possible with current metal wire connectors, and provides users with new ways to use devices.

2.      Keyssa's breakthroughs have culminated in disruptive wireless connectors that can be implemented in any electronic device.  Because the connectors are very small (smaller than a coffee bean) and can be located anywhere (including away from the edge of a device), they enable radical new form factors.  Because they are sealed and wireless, they offer unparalleled resistance to dust and water damage and eliminate the wear and tear of metal cables and pins.  Among other advantages, the connectors are power efficient, resistant to electromagnetic and radio frequency interference, secure, and easy to use.

3.      The technology industry has recognized the groundbreaking potential of Keyssa's technology, with investors including Samsung, Foxconn, SK hynix, Intel Capital, Alsop Louie Partners, Playground Venture Fund, NantWorks, Dolby Family Ventures, Tony Fadell, and Don McKinney.

4.     Defendant Essential Products, Inc. ("Essential") recognized this groundbreaking potential too when it collaborated with Keyssa to incorporate Keyssa's technology into its Essential Phone.  Under a Non-Disclosure Agreement, Keyssa divulged to Essential proprietary technology enabling every facet of Keyssa's wireless connectivity, including antennae, transmitter, and receiver designs; circuitry and semiconductor architecture; material compositions; mechanical and electromagnetic structural design elements to maximize signal integrity and minimize electromagnetic interference, radiofrequency interference, crosstalk, and electrostatic discharge; power negotiation and device detection schemes; mechanical alignment and tolerance; and simulation, testing, and validation.

5.     After over ten months of collaboration, Essential ended its relationship with Keyssa.  In November 2016, Essential informed Keyssa that it would use SiBEAM's Snap wireless chip rather than Keyssa's wireless solution.  Under the terms of the Non-Disclosure Agreement, Essential was obligated to return all Keyssa confidential material to it, and not make any commercial or other use of it.

6.     Despite these obligations, Essential misappropriated Keyssa's trade secrets without attribution or compensation to Keyssa.  The facts detailed in this Complaint show that the Essential Phone and Essential 360° Camera embody Keyssa's proprietary wireless technology. Essential did not incur any of the risk, time, or expense that Keyssa incurred in independently developing its own wireless connectivity solutions and, therefore, Essential should not be permitted to misappropriate Keyssa's trade secret wireless connector accessory technology in order to unjustly enrich itself.

7.     In light of Essential's misappropriation of Keyssa's trade secrets and breach of the parties' Non-Disclosure Agreement, Keyssa brings this Complaint to obtain compensation for the damages it has suffered and for Essential's unjust enrichment resulting from its unlawful conduct. In addition, Keyssa is entitled to injunctive relief to prevent Essential's ongoing misappropriation of Keyssa's trade secrets.

1

**II.    PARTIES**

2

     8.     Plaintiff Keyssa, Inc. is a Delaware company with its principal place of business at

3

655 Campbell Technology Parkway, Suite 275, Campbell, California 95008.  Keyssa, Inc. owns

4

all of the trade secrets and confidential information misappropriated by Essential.

5

     9.     Defendant Essential Products, Inc. is a Delaware company with its principal place

6

of business at 380 Portage Ave, Palo Alto, California 94306.

7

**III.   JURISDICTION AND VENUE**

8

     10.    This Court has subject matter jurisdiction over Keyssa's federal trade secret claim

9

pursuant to 18 U.S.C. § 1836 and 28 U.S.C. § 1331.  The Court has supplemental jurisdiction over

10

Keyssa's state law claims pursuant to 28 U.S.C. § 1367.

11

     11.    As set forth above, Essential resides in this judicial district.  In addition, a

12

substantial part of the events or omissions giving rise to the claims alleged in this Complaint

13

occurred in this judicial district.  Venue therefore lies in this Court pursuant to 28 U.S.C. §

14

1391(b)(1)-(2).

15

**IV.   INTRADISTRICT ASSIGNMENT**

16

     12.    The parties' Non-Disclosure Agreement, which in part gives rise to the claims

17

alleged in this Complaint, provides that the state and federal courts located in the County of San

18

Francisco "shall have the sole and exclusive jurisdiction over any and all disputes and causes of

19

action arising out of or relating to" the Non-Disclosure Agreement or a party's performance under

20

the Non-Disclosure Agreement.  Accordingly, for purposes of intradistrict assignment, a

21

substantial portion of this action arose in the County of San Francisco, and this case should be

22

assigned to the San Francisco Division of this Court.

23

**V.    FACTUAL ALLEGATIONS**

24

     **A.    Keyssa Revolutionizes High-Speed Wireless Connectors**

25

     13.    From its founding in 2009, Keyssa has set out to disrupt the field of metal wire

26

connectors.  Metal wire connectors—such as USB, DisplayPort, and HDMI—have many

27

disadvantages.  They create vulnerabilities to electromagnetic interference, radiofrequency

28

1  interference, electrostatic discharge, and water and dust contamination.  They degrade and often

2  fracture over time.  They require holes in otherwise seamless designs.  Despite these

3  disadvantages, metal wire connectors remain dominant in computing and mobile designs due to

4  their low cost and availability, and represent an over $60 billion per year industry.

5          14.    Keyssa's mission was, and still is, to eliminate metal wire connectors while

6  enabling point-to-point data transmission without sacrificing transmission speed.  Keyssa

7  recognized that the solution was transmitting high speed data in the Extremely High Frequency

8  ("EHF") transmission range—30 GHz to 300 GHz, or **30 billion to 300 billion cycles per second**,

9  fast enough to transmit a one gigabyte high-definition movie **in under two seconds**.  Harnessing

10  radiowaves in the 1 to 10 mm range was uncharted territory, with unexplored (and later,

11  unexpected) physics hurdles, requiring Keyssa to pioneer an entirely new field of industrial

12  design.

13          15.    Over the past eight years, Keyssa has invested many tens of millions of dollars and

14  tens of thousands of engineering hours into cracking close-range contactless wireless EHF

15  connectivity.  A dedicated team of engineers and scientists—with experience across a broad range

16  of disciplines and with pedigrees from AMD, Broadcom, LSI Logic, TriQuint, Vitesse, Silicon

17  Image, Texas Instruments, and other leading technology companies—developed breakthrough

18  solutions combining technologies from the material sciences, mechanical design, electrical and

19  electromagnetic engineering, circuitry, and semiconductor fields.  These efforts have yielded

20  countless trade secrets and more than 100 issued patents worldwide.

21          **B.    Keyssa and Essential Enter Into a Non-Disclosure Agreement To Protect
              Keyssa's Proprietary Technology and Engineering Solutions**

22

23          16.    In August 2015, Andy Rubin, the father of the Android operating system, initiated

24  due diligence by the Playground Venture Fund in Keyssa (which led to an investment by

25  Playground in Keyssa), and subsequently approached Keyssa regarding the development of a

26  wireless accessory connector for a new smartphone that would later become the Essential Phone.

27  Keyssa decided to engage with Essential on this accessory connector project because Keyssa had

28  already conducted a substantial amount of development relating to the implementation of Keyssa's

technology in phones and modular attachments.  After initial introductions and an exchange of information, Keyssa and Essential signed a Non-Disclosure Agreement ("NDA") on February 5, 2016.  A true and correct copy of the NDA is attached to this Complaint as Exhibit A.

17.     The NDA defines "Proprietary Information" as "all confidential or proprietary information disclosed by Discloser to Recipient, either directly or indirectly, in writing, orally or by inspection of tangible objects."  Such information must be either (1) "conspicuously marked as 'Confidential,' 'Proprietary' or in a similar manner," (2) "if such information is communicated orally or visually, is identified as confidential at the time of disclosure and is confirmed in writing as being Proprietary Information within thirty (30) days after the initial disclosure," or (3) if "that information that is of a nature such that a reasonably prudent business person would understand it to be confidential or proprietary shall be deemed to be Proprietary Information in the absence of such written confirmation."  Ex. A at ¶ 2.

18.     The NDA obligated Essential to hold Keyssa's Proprietary Information "in strict confidence," not to make "any use whatsoever at any time" of Proprietary Information without Keyssa's consent, and not to "disclose or divulge any Proprietary Information or any information derived therefrom to any third party."  Ex. A at ¶ 3.  The NDA further required Essential to "immediately notify" Keyssa upon any "unauthorized use or disclosure of Proprietary Information, or any other breach of this Agreement."  Ex. A at ¶ 3.

19.     The NDA also required that "[i]mmediately upon (i) the decision by either party not to enter into the contemplated relationship or transaction, (ii) termination or expiration of this Agreement in accordance with Section 10, or (iii) a request by Discloser at any time, Recipient will (a) cease any use of the Discloser's Proprietary Information and (b) turn over to Discloser all manifestations of Proprietary Information, and all documents and media containing such Proprietary Information, and all copies, summaries and extracts thereof in Recipient's possession or control."  Ex. A at ¶ 6.

20.     Finally, in signing the NDA, Essential "acknowledge[d] that any unauthorized disclosure or use of Proprietary Information will constitute a ***material breach of this Agreement***

and cause substantial harm to Discloser for which damages would not be a fully adequate remedy. In the event of any such breach, in addition to other available remedies, Discloser shall have the right to seek equitable relief (without being required to post a bond or other form of security)." Ex. A at ¶ 11.  The NDA further provides that "[t]he prevailing party in any action to enforce this Agreement shall be entitled to an award of its costs and fees (including attorneys' fees and expert witness fees) incurred in connection with such action."  Ex. A at ¶ 12.

### C.     Keyssa Provides Its Technology and Engineering Guidance to Essential To Develop the Wireless Accessory Connector for the Essential Phone

21.     Over the next 10 months, Keyssa deployed a team of 20 of its top engineers and scientists to assist Essential in the development of all facets of its wireless accessory connector. Relying on the protections embodied in the NDA, Keyssa disclosed voluminous proprietary information to Essential during this time period.

22.     Many thousands of confidential emails, hundreds of confidential technical documents, and dozens of confidential presentations were sent to Essential, regarding:

a)   Circuitry and semiconductor architecture, including design files exchanged between the parties with iterative modifications by Keyssa engineers.

b)   Detailed antennae, transmitter, and receiver designs to minimize channel crosstalk and maximize signal integrity.

c)   System architecture to enable wireless EHF millimeter wave transmission of image data.

d)   Material compositions, engineering specifications, and component sourcing information for housings, absorbers, cases, coatings, and lenses.

e)   Methods for minimizing electromagnetic interference, radiofrequency interference, and electrostatic discharge.

f)   Heat dissipation and thermal management architecture, including distribution of thermal elements and heat sinks.

g)   Power negotiation and device detection schemes for management of accessory connection and disconnection, exposure to water, and bi-directional power flow.

h)   Methods for mechanical alignment of device and connected accessories, as well as for maximization of misalignment tolerance.

i)   Proprietary simulation methods for all components and sub-components of the wireless accessory connector.

j)   Proprietary test and validation methods for materials, components and sub-components of the wireless accessory connector.

23.     Keyssa labeled files provided to Essential as "Confidential," "Keyssa Confidential per Essential NDA," or "Confidential property of Keyssa," or otherwise provided information to Essential of a technical and scientific nature such that a reasonably prudent business person would have understood it to be confidential or proprietary to Keyssa.

24.     Between February 2016 and December 2016, numerous Essential employees visited Keyssa's offices and laboratories in Campbell, California and Portland, Oregon for multiple in-person meetings with senior Keyssa engineers and scientists, including for design consultations and demonstrations of Keyssa's advanced simulation and testing methods.  To help Essential implement Keyssa's technology in the Essential Phone, Keyssa also sent its engineers to Essential's facilities.  A non-exhaustive exemplary description of these meetings, and what was discussed, is set forth below.

25.     In February 2016, Keyssa met with Essential and discussed materials and materials properties for design for communication in the 60 GHz frequency band used by Keyssa's products, including plastics, glass, ceramics, absorbers, and other materials.  Keyssa and Essential also discussed implementation of a PCIe interface for communication with the Essential peripheral.

26.     In March 2016, Keyssa and Essential began working on schematics and layout for the Essential Phone.  As part of this process, Keyssa began the mechanical and electromagnetic review and simulations for the Essential Phone.  Keyssa and Essential also discussed alignment and mechanical design tolerances.

27.     In April through July 2016, Keyssa continuously updated the schematics and layouts for the wireless accessory connector in the Essential Phone.  Keyssa also tested proposed components and materials for the Essential Phone.

28.     In August 2016, Keyssa assembled a functional prototype of its design for Essential.  Keyssa continued to perform mechanical and electromagnetic simulations for updated mechanicals and spacing and updated schematics and layouts.

29.     In October 2016, Keyssa provided a step file to show how the Essential Phone would be mounted for testing during production.  Keyssa provided updated EM simulation results to Essential.

**D.     Essential Severs Its Relationship With Keyssa But Continues To Use Keyssa's Intellectual Property Without Keyssa's Permission and Markets the Features Enabled by Keyssa's Intellectual Property as Central to the Essential Phone's Value Proposition**

30.     In November 2016, after Keyssa had contributed thousands of engineering hours developing the Essential Phone, Essential informed Keyssa it did not intend to move forward with Keyssa's wireless accessory connector solution.  Instead, Essential decided to incorporate SiBEAM's Snap chips into the Essential Phone and Essential 360° Camera.  Essential's stated reasons for its decision included its desire for compatibility with USB 2.0 accessories.  Essential has not returned any of the confidential information provided by Keyssa under the NDA.

31.     Essential released the Essential Phone and Essential 360° Camera to the market on or about September 1, 2017.

32.     Although the Essential Phone and Essential 360° Camera utilize the Snap chips, the Essential Phone and Essential 360° Camera incorporate vast amounts of Keyssa's proprietary technologies.  Essential's unauthorized use of these technologies constitutes a misappropriation of Keyssa's trade secrets and a breach of the parties' NDA.  Moreover, Essential has refused to acknowledge or compensate Keyssa for Essential's use of Keyssa's intellectual property.

33.     The functionality provided by the Keyssa proprietary technology and know-how, which Essential ultimately attempted to implement with the SiBEAM Snap chip, has been positioned by Essential and Andy Rubin as a key factor differentiating the Essential Phone from other phones on the market.

34.     Essential has heavily touted the Essential Phone's wireless accessory connector in its marketing, advertising, and other public communications regarding the Essential Phone.  On its webpage (https://www.essential.com/), Essential states:

> **Accessories that simply Click.**  Don't you hate it when you have to buy new dongles, chargers, and accessories every time your phone is upgraded?  We do too. So we decided to make this a thing of the past.  The magnetic connector with

wireless data transfer keeps your phone cord-free, future-proof, and always up-to-date.

https://www.essential.com/#introduction.

35.     Essential also illustrates its wireless accessory connector on its website:




The Essential website states that "To get a true, crafted feel, we selected unusual materials: titanium and ceramic.  Each offers its own challenges, and our task was developing new processes to get them right.  But the end result is worth it."  *Id.*

36.     With respect to the Essential Phone's wireless accessory connector, Mr. Rubin described it in an interview with GQ as a "a new notion of what an accessory is, and trying to make the accessory as ***future-proof*** as possible."  He also stated "Let's say I come up with ***a new phone in the future*** . . .[a]nd let's say it looks nothing like this. I don't want the person who bought an accessory to have to throw it out and buy the new accessory for the new form factor."
http://www.gq.com.au/entertainment/tech/former+apple+google+and+android+engineer+
builds+ranti+iphoner,50763.

37.     Sprint, Essential's major cellular carrier partner at launch, highlighted the 360° modular camera as the Essential Phone's primary feature in its broadcast advertisement of the Essential Phone.



Share it in 360° with the new Essential Phone
Sprint ✓  1.6K views • 2 weeks ago
Get the new **Essential Phone** for 50% off with **Sprint** Flex Lease, only on **Sprint**. With its sleek titanium body, it'll resist dents and ...

https://www.youtube.com/watch?v=2ZFK-vP8BeE.

38.     The Essential Phone's wireless accessory connector design concept has also received positive coverage by the media.  For example, GQ described the wireless accessory

1   connector as the "most important feature" of the Essential Phone, and BGR described the wireless

2   accessory connector as "revolutionary," noting that "accessories can easily attach to your device

3   so it's future-proof and always up-to-date."  http://www.gq.com.au/entertainment/tech/

4   former+apple+ google+and+android+engineer+ builds+ranti+iphoner,50763; http://bgr.com

5   /2017/08/31/essential-phone-unlocked-price-amazon/.

### FIRST CLAIM FOR RELIEF

**Violation of Defend Trade Secrets Act, 18 U.S.C. § 1836 *et seq*.**

8       39.      Keyssa incorporates all of the above paragraphs as though fully set forth herein.

9       40.      Keyssa owns and possesses certain confidential, proprietary, and trade secret

10  information, as described above.  One example of Keyssa's trade secret information is reflected in

11  the power negotiation system reflected in certain design files Keyssa provided to Essential under

12  the parties' NDA.  Power management is extremely important in smartphones to maximize battery

13  life.  Various aspects of these designs constitute Keyssa's trade secrets, including circuitry and

14  semiconductor architecture embodied in design files exchanged between the parties.  Keyssa's

15  trade secret information also includes material composition and qualification for use with EHF

16  millimeter wave transmissions, engineering specifications, and sourcing information for housings,

17  absorbers, cases, and coatings described in certain design presentations and other files disclosed to

18  Essential.  Keyssa's trade secret information also includes system architecture to wirelessly

19  transmit camera data by EHF, manage power, and minimize electromagnetic and radio frequency

20  interference.  Keyssa's trade secret information also includes methods for simulation, testing, and

21  validation disclosed in communications between the parties.

22      41.      Keyssa's confidential, proprietary, and trade secret information relates to products

23  and services used, sold, shipped and/or ordered in, or intended to be used, sold, shipped and/or

24  ordered in, interstate or foreign commerce.

25      42.      Keyssa has taken reasonable measures to keep such information secret and

26  confidential.

27

28

43.     Keyssa has maintained stringent security measures to preserve the secrecy of its wireless connector trade secrets.  These efforts include, but are not limited to, the use of passwords and encryption to protect data on its computers, servers, and source code repositories, the use of magnetic keycards and security logs at Keyssa's offices and laboratories, and the use of confidentiality agreements and non-disclosure agreements to require vendors, partners, contractors, and employees to maintain the secrecy of Keyssa's confidential information.  Due to these security measures, Keyssa's confidential, proprietary, and trade secret information is not available for others in the wireless connectivity, smartphone, or smartphone accessory industries—or any other industry—to use through any legitimate means.

44.     Keyssa's confidential, proprietary, and trade secret information derives independent economic value from not being generally known to, and not being readily ascertainable through proper means by, another person who could obtain economic value from the disclosure or use of the information.

45.     In violation of Keyssa's rights, Essential misappropriated Keyssa's confidential, proprietary, and trade secret information in the improper and unlawful manner as alleged herein. Essential's misappropriation of Keyssa's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Essential has attempted and continues to attempt to conceal its misappropriation.

46.     On information and belief, if Essential is not enjoined, Essential will continue to misappropriate and use Keyssa's confidential, proprietary, and trade secret information for their own benefit and to Keyssa's detriment.

47.     As the direct and proximate result of Essential's conduct, Keyssa has suffered and, if Essential's conduct is not stopped, will continue to suffer, severe competitive harm, irreparable injury, and significant damages, in an amount to be proven at trial.  As a further direct and proximate result of the misappropriation and use of Keyssa's confidential, proprietary and trade secret information, Essential has been unjustly enriched.  Because Keyssa's remedy at law is inadequate, Keyssa seeks, in addition to damages, temporary, preliminary, and permanent

1   injunctive relief to recover and protect its confidential, proprietary, and trade secret information

2   and to protect other legitimate business interests.  Keyssa's business operates in a competitive

3   market and will continue suffering irreparable harm absent injunctive relief.

4        48.    As a direct and proximate result of Essential's misappropriation of Keyssa's

5   confidential, proprietary, and trade secret information, Keyssa has suffered and continues to suffer

6   substantial damages, in an amount to be proven at trial, and is entitled to an award of exemplary

7   damages and attorneys' fees.

8   **<u>SECOND CLAIM FOR RELIEF</u>**

9   **Violation of California Uniform Trade Secrets Act, Cal. Civ. Code § 3426 *et seq.***

10       49.    Keyssa incorporates all of the above paragraphs as though fully set forth herein.

11       50.    Keyssa's technical information, designs, and other "know how" related to its

12  wireless connectivity technology constitute trade secrets as defined by California's Uniform Trade

13  Secrets Act.  Keyssa owns and possesses certain confidential, proprietary, and trade secret

14  information, as described above.  One example of Keyssa's trade secret information is reflected in

15  the power negotiation system reflected in certain design files Keyssa provided to Essential under

16  the parties' NDA.  Power management is extremely important in smartphones to maximize battery

17  life.  Various aspects of these designs constitute Keyssa's trade secrets, including circuitry and

18  semiconductor architecture embodied in design files exchanged between the parties.  Keyssa's

19  trade secret information also includes material composition and qualification for use with EHF

20  millimeter wave transmissions, engineering specifications, and sourcing information for housings,

21  absorbers, cases, and coatings described in certain design presentations and other files disclosed to

22  Essential.  Keyssa's trade secret information also includes system architecture to wirelessly

23  transmit camera data by EHF, manage power, and minimize electromagnetic and radio frequency

24  interference.  Keyssa's trade secret information also includes methods for simulation, testing, and

25  validation disclosed in communications between the parties.

26       51.    Keyssa has undertaken efforts that are reasonable under the circumstances to

27  maintain the secrecy of the trade secrets at issue.

28

52.     Keyssa has at all times maintained stringent security measures to preserve the secrecy of its wireless connector trade secrets.  These efforts include, but are not limited to, the use of passwords and encryption to protect data on its computers, servers, and source code repositories, the use of magnetic keycards and security logs at Keyssa's offices and laboratories, and the use of confidentiality agreements and non-disclosure agreements to require vendors, partners, contractors, and employees to maintain the secrecy of Keyssa's confidential information.

53.     In violation of Keyssa's rights, Essential misappropriated Keyssa's confidential, proprietary, and trade secret information in the improper and unlawful manner as alleged herein. Essential's misappropriation of Keyssa's confidential, proprietary, and trade secret information was intentional, knowing, willful, malicious, fraudulent, and oppressive.  Essential has attempted and continues to attempt to conceal its misappropriation.

54.     As a direct and proximate result of Essential's conduct, Keyssa is threatened with injury and has been injured in an amount in excess of the jurisdictional minimum of this Court and that will be proven at trial.  As a further direct and proximate result of the misappropriation and use of Keyssa's confidential, proprietary and trade secret information, Essential has been unjustly enriched.  Keyssa has also incurred, and will continue to incur, additional damages, costs and expenses, including attorneys' fees, as a result of Essential's misappropriation.

55.     The aforementioned acts of Essential were willful, malicious and fraudulent. Keyssa is therefore entitled to exemplary damages under California Civil Code § 3426.3(c).

56.     Essential's conduct constitutes transgressions of a continuing nature for which Keyssa has no adequate remedy at law.  Unless and until enjoined and restrained by order of this Court, Essential will continue to retain and use Keyssa's confidential, proprietary, and trade secret information to enrich itself and divert business from Keyssa.  Pursuant to California Civil Code § 3426.2, Keyssa is entitled to an injunction against the misappropriation and continued threatened misappropriation of Keyssa's confidential, proprietary, and trade secret information as alleged herein and further asks the Court to restrain Essential from using all confidential, proprietary, and

trade secret information misappropriated from Keyssa and to return all confidential, proprietary, and trade secret information to Keyssa.

57.     As a direct and proximate result of Essential's misappropriation of Keyssa's confidential, proprietary, and trade secret information, Keyssa has suffered and continues to suffer substantial damages, in an amount to be proven at trial, and is entitled to an award of exemplary damages and attorneys' fees.

<u>**THIRD CLAIM FOR RELIEF**</u>

**Breach of Contract**

58.     Keyssa incorporates all of the above paragraphs as though fully set forth herein.

59.     The NDA between Keyssa and Essential is a valid and enforceable contract.

60.     Essential has breached its obligations to Keyssa under the NDA to hold Keyssa's Proprietary Information "in strict confidence," including through its offer for sale and sale of the Essential Phone and Essential 360° Camera, and through its communication of Keyssa's Proprietary Information to third parties, including to the manufacturer of the Essential Phone and Essential 360° Camera.

61.     Essential has also breached its obligations under the NDA not to make "any use whatsoever at any time" of Proprietary Information without Keyssa consent, including through its manufacture, offer for sale, and sale of the Essential Phone and Essential 360° Camera.

62.     Essential has also breached its obligations under the NDA not to "disclose or divulge any Proprietary Information or any information derived therefrom to any third party," including through its offer for sale and sale of the Essential Phone and Essential 360° Camera, and through its communication of Keyssa's Proprietary Information to third parties, including to the manufacturer of the Essential Phone and Essential 360° Camera and the suppliers of semiconductor devices providing contactless connectivity in the Essential Phone.

63.     Essential has also breached its obligations under the NDA to notify Keyssa of the unauthorized disclosure of Keyssa's Proprietary Information and other breaches of the NDA.

64.     Finally, Essential has breached its obligations under the NDA to return to Keyssa "all manifestations of Proprietary Information, and all documents and media containing such Proprietary Information, and all copies, summaries and extracts thereof in Recipient's possession or control."

65.     The Proprietary Information provided to Essential under the NDA (a) was not publicly known and made generally available in the public domain prior to the time of disclosure by Essential; (b) has not become publicly known and made generally available after disclosure by Keyssa to Essential; (c) was not already in Essential's possession without restriction on use or disclosure at the time of disclosure by Keyssa; (d) did not become available to Essential without restriction on use or disclosure from a third party without a breach of that third party's obligations of confidentiality; and (e) was not independently developed by Essential without use of or reference to any Proprietary Information.

66.     Keyssa has performed all conditions, covenants, and promises to be performed by it with respect to the NDA, except for those conditions, covenants, and promises that have been excused by reason of Essential's breaches alleged herein.

67.     As a direct and proximate result of Essential's material breaches of the NDA, Keyssa has suffered and continues to suffer substantial damages, in an amount to be proven at trial, and is further entitled to an award of fees, including attorneys' fees and any expert witness fees.

## PRAYER FOR RELIEF

WHEREFORE, Keyssa respectfully requests the following relief:

68.     Judgment in Keyssa's favor and against Essential on all claims for relief alleged herein;

69.     For preliminary and permanent injunctive relief;

70.     For damages in an amount to be proven at trial;

71.     For exemplary damages;

72.     For prejudgment interest;

73.     For attorneys' fees and costs; and

74.     For such other and further relief as the Court may deem to be just and proper.

## **DEMAND FOR JURY TRIAL**

Keyssa demands trial by jury for all claims for relief or issues in this action that are triable as a matter of right to a jury.

DATED:  October 16, 2017                QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                        By _____ */s/ David Eiseman* _____
                                           David Eiseman
                                           Attorneys for Plaintiff KEYSSA, INC.